Filed 12/14/18

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D072597 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN368628) |
| RICHARD L. LADUKE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Blaine K. Bowman, Judge. Affirmed as modified.

Cathryn Lintvedt Rosciam, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

---

*       Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II through IV.

Richard L. LaDuke appeals a judgment following his jury conviction of arson (Pen. Code,[1] § 451, subd. (d)), vandalism of a religious educational institution (§ 594.3, subd. (a)), and felony vandalism causing over $400 in damage (§ 594, subds. (a), (b)(1)). At sentencing, the trial court granted him three years of formal probation, subject to certain conditions of probation. On appeal, he contends: (1) there is insufficient evidence to support his conviction for vandalism of a religious educational institution (§ 594.3, subd. (a)); (2) that conviction must be reversed because section 594.3, subdivision (a) is unconstitutional under the United States and California Constitutions; (3) his conviction for felony vandalism causing over $400 in damage (§ 594, subds. (a), (b)(1)) must be reversed because it is a necessarily included offense of vandalism of a religious educational institution (§ 594.3, subd. (a)); and (4) the electronics search condition of his probation is unconstitutionally overbroad. Because, as discussed *post*, we conclude the electronics search probation condition is unreasonable in this case, we modify the probation order to strike that condition and affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

At about 9:45 a.m. on January 15, 2017, LaDuke squirted lighter fluid on a sign in front of John Paul the Great Catholic University (University) in Escondido and then lit the sign on fire. After about 30 seconds, LaDuke sprayed the sign with lighter fluid again and relit the sign on fire. The sign was made of aluminum and plastic and was mounted

---

[1] All statutory references are to the Penal Code except as otherwise specified.

on a red brick base, and each side of the sign had an image of the crucifix and the words, "John Paul the Great Catholic University." LaDuke burned both sides of the sign and left after about five minutes. The sign was charred with black burn marks.

A police officer stopped LaDuke a few blocks away. LaDuke had a lighter in his front right pocket. An eyewitness identified him as the person who lit the sign on fire.

The University is a nonprofit educational institution with about 300 students enrolled in theology, creative arts, and business programs. It was founded and is based on the Catholic faith. One-third of its students major in theology and all students are required to take theology or religious philosophy classes. Most of its students are Catholic. Students are encouraged to attend mass services, which are held on campus daily. The University paid $12,000 to replace the damaged sign.

An information charged LaDuke with arson (§ 451, subd. (d)), vandalism of a building owned and occupied by a religious educational institution (§ 594.3, subd. (a)), and vandalism causing damage in excess of $400 and also in excess of $10,000 (§ 594, subds. (a), (b)(1)). At trial, the prosecution presented evidence substantially as described *ante*. In his defense, LaDuke testified that he was 63 years old, unemployed, and homeless. He stated that he was upset that "the Jews are always blamed for the crucifixion of Jesus" and decided to relieve himself of the burden of being "blamed for crucifying Christ." He admitted he bought a lighter and "some barbecue things" (e.g., lighter fluid), poured lighter fluid all over the University's sign, and lit the sign on fire. On cross-examination, LaDuke admitted he knew the sign had the name, "John Paul the Great Catholic University," on it. He knew the University was a Catholic university.

3

He also saw that the sign had a cross on it, symbolizing Christ on the cross. He knew burning the sign was wrong, but he did not care. He stated a priest at the University refused to talk to him. He did not consider the University a religious organization. He asserted that Catholicism was a "group of teachings" with which he did not agree.

The jury convicted him on all three counts and found the damage on count three (§ 594, subds. (a), (b)(1)) was over $400, but less than $10,000. At sentencing, the trial court suspended imposition of sentence and granted LaDuke three years of formal probation, subject to certain conditions. One probation condition required that he consent to warrantless searches of "personal effects, computers, and recordable media." LaDuke timely filed a notice of appeal.

DISCUSSION

I

*Substantial Evidence to Support LaDuke's Section 594.3, Subdivision (a) Conviction*

LaDuke contends there is insufficient evidence to support his section 594.3, subdivision (a) conviction of vandalism of a building owned and occupied by a religious educational institution. In particular, he argues that the sign was not a "building," or part of a building, owned and occupied by a religious educational institution within the meaning of section 594.3, subdivision (a).

A

Following the close of evidence at trial, LaDuke made a section 1118.1 motion to dismiss the section 594.3, subdivision (a) charge against him. He argued that the statute protected only "buildings" and the sign was not attached to, or any part of, any building.

4

The court concluded that the Legislature intended the statute to apply to both personal property and real property. It also noted that there would be no need for the sign unless there was a building it needed to identify. It also stated that burning the sign was more egregious than burning a part of the building because the sign featured a cross and the word "Catholic." The court denied the section 1118.1 motion.

B

When a conviction is challenged on appeal for insufficient evidence to support it, we apply the substantial evidence standard of review. (*People v. Vines* (2011) 51 Cal.4th 830, 869; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) In so doing, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the conviction. (*Vines*, at p. 869; *Johnson*, at p. 578.) Substantial evidence is evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 660.)

In contrast, in reviewing a trial court's interpretation of a statute, we apply a de novo, or independent, standard of review. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.) In independently interpreting a statute, our task is to ascertain and effectuate the law's intended purpose. (*Weatherford v. City of San Rafael* (2017) 2 Cal.5th 1241, 1246.) In interpreting a statute, we look first to the statute's words. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) The statutory language is generally the most reliable indicator of legislative intent. (*People v. Cordell* (2011) 195 Cal.App.4th 1564, 1575; *Whaley v. Sony Computer Entertainment America,*

5

*Inc.* (2004) 121 Cal.App.4th 479, 484-485.)  If the statutory language is unambiguous, we will presume the Legislature meant what it said and the plain meaning of the statute will prevail unless its literal meaning would result in absurd consequences that the Legislature did not intend.  (*Cordell*, at p. 1575; *Whaley*, at pp. 484-485; *Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630.)

However, if the statutory language is ambiguous and is reasonably susceptible to more than one meaning, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.  (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 992 (*DiCampli-Mintz*).)  Our ultimate objective in interpreting a statute is to construe the statute in a way that most closely comports with the apparent intent of the Legislature. (*People v. Rubalcava* (2000) 23 Cal.4th 322, 328.)

C

LaDuke argues there is insufficient evidence to support his section 594.3, subdivision (a) conviction because the sign was not a "building" within the meaning of that statute.  Section 594.3, subdivision (a) provides:

> "Any person who knowingly commits any act of vandalism to a church, synagogue, mosque, temple, *building owned and occupied by a religious educational institution*, or other place primarily used as a place of worship where religious services are regularly conducted or a cemetery is guilty of a crime punishable by imprisonment in a county jail for not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."  (Italics added.)

6

Section 594.3 does not define the term "building," nor is that term defined elsewhere in the Penal Code in the context of vandalism. The parties have not cited, and we are unaware of, any published case interpreting the phrase "building owned and occupied by a religious educational institution" within the meaning of section 594.3, subdivision (a). Accordingly, the question of the meaning of that phrase appears to be one of first impression.

LaDuke argues the term "building," as used in section 594.3, subdivision (a), necessarily refers to a structure that can be owned and occupied. He cites *People v. Muszynski* (2002) 100 Cal.App.4th 672, in which the court concluded the term "building" was ambiguous in the context of the offense of arson and was reasonably susceptible to multiple interpretations. (*Id.* at p. 683.) After reviewing the legislative history of the arson statute, the court interpreted the term "building" as not including an individual apartment within an apartment complex. (*Id.* at pp. 681, 683.) LaDuke also notes that the term "building" has been interpreted in the context of burglary as a structure with four walls and a roof and includes carports and other structures that are attached to, and an integral part of, the building. (See, e.g., *People v. Gibbons* (1928) 206 Cal. 112, 114; *People v. Chavez* (2012) 205 Cal.App.4th 1274, 1279; *In re Christopher J.* (1980) 102 Cal.App.3d 76, 78-79.) Relying on those arson and burglary cases, LaDuke argues that the term "building," as used in section 594.3, subdivision (a), should be interpreted as a structure with four walls and a roof that can be occupied and therefore the term "building" would not include a stand-alone sign such as the one in this case.

In contrast, the People argue the term "building" should be interpreted broadly to achieve the legislative objectives of section 594.3, subdivision (a). Citing various dictionary definitions of the term "building," the People argue that we should interpret that term, as used in section 594.3, subdivision (a), to include anything that is built or constructed (e.g., a structure).[2] Citing Civil Code section 660,[3] the People further argue the term "building" should include fixtures (e.g., things that permanently rest upon or are permanently attached or affixed to land). Because the University's sign was a structure that was permanently affixed to its land, the People argue that sign should be included within the term "building," as used in section 594.3, subdivision (a). The People also argue that by enacting section 594.3, subdivision (a), the Legislature intended to protect the rights of individuals to freely exercise their religious beliefs without the fear of vandalism of the places at which they exercise those beliefs.

Considering the parties' arguments and the language of section 594.3, subdivision (a), we conclude the phrase "building owned and occupied by a religious educational institution," as used in that statute, is reasonably susceptible to more than one meaning. One reasonable narrow interpretation of the term "building" is, as LaDuke

---

[2]     For example, the People cite one dictionary's definition of the term "building" as meaning "a thing built." (Webster's 3d New Internat. Dict. (2002) p. 292.) Likewise, they cite another definition of the term "building" as meaning "anything built or constructed." (Random House Unabridged Dict. (2d ed. 1993) p. 274.)

[3]     Civil Code section 660 provides: "A thing is deemed to be affixed to land when it is attached to it by roots . . . ; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws . . . ."

8

argues, a structure that has four walls and a roof and is occupied. In contrast, a reasonable broad interpretation of the term "building" is, as the People argue, any structure or thing built, including any fixtures attached thereto. Given more than one reasonable interpretation of the statutory language of section 594.3, subdivision (a), we must construe that ambiguous language by determining its legislative intent, and, in so doing, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, construction, and the statutory scheme of which the statute is a part. (*DiCampli-Mintz*, *supra*, 55 Cal.4th at p. 992.)

In construing the language of section 594.3, subdivision (a), we consider, inter alia, the statutory scheme of which that statute is a part. (*DiCampli-Mintz*, *supra*, 55 Cal.4th at p. 992.) In particular, we note that the statute uses the term "vandalism," which is defined in section 594 as the malicious act of defacing, damaging, or destroying "any real or personal property" not his or her own. Therefore, "vandalism," as used in both sections 594 and 594.3, subdivision (a), necessarily includes malicious damage to either real or personal property. Because the vandalism set forth in section 594.3, subdivision (a) prohibits damage to both real and personal property, we reject LaDuke's suggested interpretation limiting that offense to damage to only an occupied structure with four walls and a roof. Instead, the statute's use of the term "vandalism" indicates the Legislature intended to prohibit malicious acts causing damage not only to the physical structure of a building, but also to personal property located within that building or on the same real property as, and related to, the building. Accordingly, we construe section

9

594.3, subdivision (a) as prohibiting, inter alia, malicious damage to personal property or fixtures located on or attached to the real property of, and related to, a "building owned and occupied by a religious educational institution." (§ 594.3, subd. (a).)

The People note that the Legislature amended section 594.3 in 1983 to add subdivision (b),[4] which subdivision defines the separate, but related, "hate crime" offense of vandalism of religious property and, in so doing, the Legislature stated that the amendment was in response to an "alarming increase in the number of incidents involving acts of vandalism to religious institutions," which acts were often done to intimidate and deter individuals "from freely exercising their religious beliefs." (Stats. 1983, ch. 726, § 2(a), (b).) Although that amendment involved a different subdivision and different offense, we believe it is reasonable to presume the Legislature held the same concerns when originally enacting section 594.3, subdivision (a) two years earlier. Therefore, the Legislature's expressed concerns in 1983 are instructive in interpreting section 594.3, subdivision (a), which was enacted in 1981. (Stats. 1981, ch. 211, § 2.) In particular, we infer that in enacting that statute, the Legislature sought to protect the rights of persons to freely exercise their religious beliefs by making it a criminal offense to vandalize certain religious properties, including buildings owned and

---

4      Section 594.3, subdivision (b) provides:  "Any person who knowingly commits any act of vandalism to a church, synagogue, mosque, temple, building owned and occupied by a religious educational institution, or other place primarily used as a place of worship where religious services are regularly conducted or a cemetery, which is shown to have been a hate crime and to have been committed for the purpose of intimidating and deterring persons from freely exercising their religious beliefs, is guilty of a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170."

10

occupied by religious educational institutions. To further that legislative purpose, we presume the Legislature intended to prohibit malicious damage not only to the actual physical structures within which religious or religious educational activities are conducted, but also to personal property or fixtures located on or attached to the real property of, and related to, that structure or "building owned and occupied by a religious educational institution." (§ 594.3, subd. (a).)

Based on our interpretation *ante* of section 594.3, subdivision (a), we conclude the University's sign, which was located in front of, on the same real property as, and related to, the physical structure within which its educational activities are conducted, was either personal property or a fixture located on or attached to the real property of, and related to, that structure and therefore could reasonably be found by the jury to be part of the "building owned and occupied" by the University within the meaning of that statute. The instant sign, made of aluminum and plastic, was built by a contractor who installed it on a red brick base on the University's real property. The sign had an image of the crucifix and the words, "John Paul the Great Catholic University," identifying the physical structure behind it as part of the University and also identifying the University as a religious educational institution. Whether considered personal property or a fixture, the jury could therefore reasonably conclude from the evidence at trial that the sign was part of the building owned and occupied by the University, which is a religious educational

11

institution.[5]  Accordingly, we conclude there is substantial evidence to support LaDuke's conviction of the section 594.3, subdivision (a) offense.

## II

### *Constitutionality of Section 594.3, Subdivision (a)*

LaDuke contends that his section 594.3, subdivision (a) conviction must be reversed because that statute is unconstitutional under the United States and California Constitutions.  In particular, he argues that statute is unconstitutional because it:  (1) is void for vagueness; (2) violates the establishment clauses of the United States and California Constitutions; (3) violates the no-preference clause of the California Constitution; and (4) violates the equal protection clauses of the United States and California Constitutions.  As discussed *post*, we reject each of his arguments.

### A

Before trial, LaDuke moved to dismiss the section 594.3, subdivision (a) charge against him on constitutional grounds.  The trial court overruled his constitutional objections and denied the motion.  The court also denied his request that its jury instruction for that charge define the phrase "religious educational institution" and denied his proposed instruction defining that phrase.  Instead, the court instructed the jury with the language of section 594.3, subdivision (a) stating:

---

5    We note that certain photographs of the sign (Exhibit Nos. 1-6) were admitted in evidence and viewed by the jury, which photographs presumably showed the sign's location adjacent to and in front of the University's structure in which its educational activities were conducted.  However, neither party lodged those exhibits with, or requested their transfer to, this court, and therefore we have not reviewed them in disposing of this appeal.

12

"The defendant is charged in Count 2 with vandalism of religious property in violation of Penal Code section 594.3.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that:

"1.  The defendant maliciously damaged or destroyed real or personal property of a building owned and occupied by a religious educational institution;

"2.  The defendant knew the property belonged to a building owned and occupied by a religious educational institution;  [¶]  AND

"3.  The defendant did not own the property.

"Someone acts *maliciously* when he or she intentionally does a wrongful act or when he or she acts with the unlawful intent to annoy or injure someone else."

On appeal, when an appellant challenges the constitutionality of a statute, we apply the de novo, or independent, standard of review.  (*People ex rel. Lockyer v. Sun Pac. Farming Co.* (2000) 77 Cal.App.4th 619, 632; *Duarte Nursery, Inc. v. California Grape Rootstock Improvement Commission* (2015) 239 Cal.App.4th 1000, 1011.)

B

*Void-for-vagueness claim.*

LaDuke asserts section 594.3, subdivision (a) is unconstitutional because it is void for vagueness.  In particular, he argues that the phrase "religious educational institution" in that statute does not put a person on notice of what specific institutions are included and thereby encourages arbitrary and discriminatory enforcement.  We disagree.

The void-for-vagueness doctrine, "which derives from the due process concept of fair warning, bars the government from enforcing a provision that 'forbids or requires the doing of an act in terms so vague' that people of 'common intelligence must necessarily

13

guess at its meaning and differ as to its application.' " (*People v. Hall* (2017) 2 Cal.5th 494, 500.)  A penal statute "must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." (*Connally v. General Const. Co.* (1926) 269 U.S. 385, 391.)  However, there is a strong presumption that statutes must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears.  (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143.)  A party challenging a statute as void for vagueness cannot carry his or her burden on appeal by merely showing the statute may be uncertain or ambiguous in some instances, but must instead show the statute is impermissibly vague in all of its applications.  (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201 (*Evangelatos*).)  An appellant "cannot prevail by simply suggesting hypothetical situations in which constitutional problems may arise." (*People v. Sipe* (1995) 36 Cal.App.4th 468, 481 (*Sipe*).)  "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.' " (*Hill v. Colorado* (2000) 530 U.S. 703, 733 (*Hill*).)

LaDuke argues section 594.3, subdivision (a) is unconstitutionally void for vagueness because its phrase, "religious educational institution," is not defined and is so vague that it fails to put a person on notice of which institutions are protected by the statute and encourages arbitrary and discriminatory enforcement.  In the circumstances of this case, LaDuke fails to persuade us that a person would not be put on notice that the University, as designated on the sign, was a religious educational institution protected by section 594.3, subdivision (a).  As noted *ante*, the sign bore the name of the University,

14

"John Paul the Great Catholic University."  By the sign's inclusion of the word, "Catholic," there could be no reasonable confusion whether the University was "religious" within the meaning of the statute.  In fact, LaDuke testified that he knew the University was a Catholic university and that the sign had the name, "John Paul the Great Catholic University," on it.  He stated that he was upset that "the Jews are always blamed for the crucifixion of Jesus" and decided to relieve himself of the burden of being "blamed for crucifying Christ" by lighting the sign on fire.  Contrary to LaDuke's apparent assertion, we conclude people of common intelligence would necessarily know that the term "Catholic" represents a religion and therefore the University, which was identified on the sign as Catholic, is a religious institution.  (*People v. Hall*, *supra*, 2 Cal.5th at p. 500.)  Although LaDuke testified at trial that he did not consider the University a religious organization and asserted that Catholicism was a "group of teachings" with which he did not agree, his personal and subjective beliefs regarding the Catholic faith are irrelevant to our determination of whether people of common intelligence would consider the instant Catholic university a religious institution within the meaning of the statute's language.

Furthermore, we conclude that people of common intelligence would know that the University is an educational institution within the meaning of section 594.3, subdivision (a).  The term "university" necessarily connotes an institution of higher learning that educates its students.  Therefore, there can be no doubt that the University is an educational institution.

15

LaDuke argues that the phrase, "religious educational institution," as used in section 594.3, subdivision (a), is nevertheless vague because a person may be confused whether it includes only seminaries or other educational institutions that are owned and operated by religious organizations and exclusively instruct their students on religion or whether that phrase applies more broadly to also include educational institutions that are merely affiliated with certain religions. However, we conclude that people of common intelligence would not construe the phrase, "religious educational institution," so narrowly as to exclude from its meaning educational institutions that are aligned or affiliated with certain religions and not owned or operated by religious organizations or that do not exclusively instruct their students on religion. It is commonly understood that many educational institutions (e.g., colleges and universities) are affiliated with certain religions, but provide their students with instruction on secular subjects, and are not owned and operated by a church or other religious organization. Therefore, we conclude people of common intelligence would understand that the phrase, "religious educational institution," was not vague or ambiguous in the circumstances of this case and clearly applied to the University.

*E.E.O.C. v. Kamehameha Schools/Bishop Estate* (9th Cir. 1993) 990 F.2d 458, cited by LaDuke and which involved the federal Civil Rights Act of 1964, is factually and procedurally inapposite to this case and does not persuade us to reach a contrary conclusion. To the extent he argues the phrase, "religious educational institution," may be ambiguous as applied to other institutions or other hypothetical situations, that argument does not show the phrase is unconstitutionally vague in this case.

16

(*Evangelatos*, *supra*, 44 Cal.3d at p. 1201; *Sipe*, *supra*, 36 Cal.App.4th at p. 481; *Hill*, *supra*, 530 U.S. at p. 733.)

Furthermore, because we conclude that the phrase, "religious educational institution," is not vague or ambiguous in the circumstances of this case, the trial court did not err, as LaDuke asserts, by not defining that phrase in its instructions to the jury or by denying his proposed instruction defining that phrase. (*People v. Griffin* (2004) 33 Cal.4th 1015, 1022 ["Although trial courts, generally, have a duty to define technical terms that have meanings peculiar to the law, there is no duty to clarify, amplify, or otherwise instruct on commonly understood words or terms used in statutes or jury instructions."].)

C

*Establishment clauses*.

LaDuke asserts section 594.3, subdivision (a) is unconstitutional because it violates the establishment clauses of the United States and California Constitutions. In particular, he argues that statute provides greater protection to religious institutions than to nonreligious or secular institutions.

The First Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides: "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof." (*Cantwell v. Connecticut* (1940) 310 U.S. 296, 303.) Similarly, article I, section 4 of the California Constitution provides: "The Legislature shall make no law respecting an establishment of religion." In interpreting the California Constitution's establishment clause, we are

17

guided by decisions of the United States Supreme Court regarding the federal establishment clause. (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 719 (*East Bay*); *Sedlock v. Baird* (2015) 235 Cal.App.4th 874, 885.) In *Lemon v. Kurtzman* (1971) 403 U.S. 602 (*Lemon*), the United States Supreme Court set forth a three-part test for determining whether a statute or governmental practice violates the establishment clause. (*Id.* at pp. 612-613.) "Under that test . . . , to satisfy the Establishment Clause a governmental practice must (1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion." (*Lee v. Weisman* (1992) 505 U.S. 577, 584-585.) A statute is unconstitutional if it fails to satisfy any of the three *Lemon* requirements. (*Edwards v. Aguillard* (1987) 482 U.S. 578, 583.)

Regarding the first prong of the *Lemon* test, we conclude section 594.3, subdivision (a) has the clear secular purposes of protecting private property from vandalism, protecting religious institutions from disruption, and protecting the free exercise of religion. The protection of the exercise of religion is a legitimate secular purpose. (See, e.g., *Larkin v. Grendel's Den, Inc.* (1982) 459 U.S. 116, 124 (*Larkin*) [protection of churches and schools from disruption is valid secular purpose]; *United States v. Corum* (8th Cir. 2004) 362 F.3d 489, 496 [curbing threats of violence against religious institutions is valid secular purpose]; *Mayweathers v. Newland* (9th Cir. 2002) 314 F.3d 1062, 1068.) The Legislature could reasonably conclude that section 594.3, subdivision (a) serves the legitimate secular purposes of protecting the free exercise of religion and protecting religious institutions, including religious educational institutions,

18

from disruption and intimidation caused by malicious vandalism. Contrary to LaDuke's apparent assertion, a statute's purpose need not be unrelated to religion. (*Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos* (1987) 483 U.S. 327, 335.) Provided a statute does not promote a particular religion or religious point of view, that statute need not maintain a "callous indifference" toward religion. (*Zorach v. Clauson* (1952) 343 U.S. 306, 314.) Because section 594.3, subdivision (a) does not promote a particular religion or religious point of view, we conclude it has legitimate secular purposes and thereby satisfies the first prong of the *Lemon* test. Contrary to LaDuke's assertion, the fact that section 594.3, subdivision (a) vandalism offenses are subject to potentially more severe punishment than for general vandalism offenses under section 594 (e.g., vandalism against nonreligious institutions) does not show that the purpose of section 594.3, subdivision (a) is religious rather than secular. To the extent that statute arguably provides greater protection to religious institutions against vandalism, it serves the legitimate secular purpose of protecting the free exercise of religion.[6]

Regarding the second prong of the *Lemon* test, we conclude section 594.3, subdivision (a) has a "primary effect . . . that neither advances nor inhibits religion." (*Lemon*, *supra*, 403 U.S. at p. 612.) That statute does not affirmatively advance religion,

---

[6] Contrary to LaDuke's assertion, the fact that section 594.3, subdivision (b), which prohibits "hate crime" acts of vandalism against religious institutions, also provides greater punishment for acts of vandalism than section 594 does for general vandalism does not show that section 594.3, subdivision (a) does not also have the legitimate secular purposes of protecting religious institutions from disruption and protecting the free exercise of religion.

19

but merely protects religious property from malicious vandalism and its inherent disruption of, or intimidation discouraging, the free exercise of religion.  By so doing, it does not promote or endorse religion, but at most provides an incidental benefit to religious institutions.  (Cf. *Carter v. Peters* (7th Cir. 1994) 26 F.3d 697, 699 ["incidental, indirect benefits to religion do not offend the second prong of the *Lemon* test"].)  Contrary to LaDuke's assertion, the statute does not demonstrate a state preference for religious institutions over nonreligious institutions.  *Texas Monthly, Inc. v. Bullock* (1989) 489 U.S. 1, cited by LaDuke and which involved a state sales tax exemption for religious publications, is factually and procedurally inapposite to this case and does not persuade us to reach a contrary conclusion.

Regarding the third prong of the *Lemon* test, we conclude section 594.3, subdivision (a) avoids excessive governmental entanglement with religion.  (*Lee v. Weisman*, *supra*, 505 U.S. at p. 585.)  That statute does not improperly intertwine churches and other religious institutions with government in its exercise of its powers.  (Cf. *Larkin*, *supra*, 459 U.S. at p. 126.)  Religious institutions have no control over how the statute is enforced by governmental agencies.  In particular, religious institutions need not consent to, or be consulted regarding, the enforcement of that statute in particular cases.  Furthermore, enforcement of section 594.3, subdivision (a) by a governmental agency does not evince any endorsement of, or entanglement with, any particular religion or religion in general.  At most, there may be incidental contact with religious institutions that is necessary to prosecute violations of that statute.  (Cf. *Agostini v. Felton* (1997) 521 U.S. 203, 233 ["Interaction between church and state is inevitable (citation), and we

20

have always tolerated some level of involvement between the two."].)  In the circumstances of this case, we conclude section 594.3, subdivision (a) does not involve excessive governmental entanglement with religion.  None of the cases cited by LaDuke are apposite to this case and he does not otherwise persuade us that the third prong of the *Lemon* test is not satisfied.[7]  Because section 594.3, subdivision (a) satisfies all three prongs of the *Lemon* test, we conclude it does not violate the establishment clauses of the United States and California Constitutions.  (*Lemon*, *supra*, 403 U.S. at pp. 612-613; cf. *United States v. Corum*, *supra*, 362 F.3d at pp. 496-497 [federal Church Arson Prevention Act did not violate establishment clause of United States Constitution].)

D

*No-preference clause*.

LaDuke asserts section 594.3, subdivision (a) is unconstitutional because it violates the no-preference clause of the California Constitution.  Article I, section 4 of the California Constitution provides in relevant part:  "Free exercise and enjoyment of religion *without* discrimination or *preference* are guaranteed."  (Italics added.)  The California Supreme Court has not yet "definitively construe[d] the [no-preference] clause."  (*East Bay*, *supra*, 24 Cal.4th at p. 719.)  Nevertheless, the Supreme Court stated: "[T]he plain language of the clause suggests . . . that the intent is to ensure that free exercise of religion is guaranteed regardless of the nature of the religious belief

---

7       The fact that section 594 provides protection against vandalism generally does not, as LaDuke asserts, necessarily show that section 594.3, subdivision (a)'s protection against vandalism against religious property involves excessive governmental entanglement with religion.

21

professed, and that the state neither favors nor discriminates against religion." (*Ibid*.) In *East Bay*, because the challenged statutes satisfied all three prongs of the *Lemon* test regarding the establishment clause, the court concluded that "it follow[ed]" that those statutes were "neither a governmental preference for or discrimination against religion." (*East Bay,* at p. 719.) The court stated: "Neither the history nor the language of the no-preference clause supports [the] argument that the clause bans governmental accommodation of religion or religious belief in general." (*Id*. at p. 720.)

Because we concluded *ante* that section 594.3, subdivision (a) satisfied all three prongs of the *Lemon* test, we, applying the same reasoning as in *East Bay*, conclude that section 594.3, subdivision (a) does not violate the no-preference clause of the California Constitution. Furthermore, because that statute neither favors nor discriminates against religion, it does not violate the no-preference clause. (*East Bay*, *supra*, 24 Cal.4th at p. 719.) Because *Sands v. Morongo Unified School Dist.* (1991) 53 Cal.3d 863 (*Sands*), cited by LaDuke, was a plurality opinion and preceded *East Bay*'s interpretation (albeit a nondefinitive one) of the no-preference clause, we conclude that *Sands*'s broader interpretation of that clause than the federal establishment clause was, in effect, overruled by *East Bay* and therefore it does not apply to our review of section 594.3, subdivision (a) in this case.[8]

---

[8] In any event, assuming arguendo that *Sands*'s interpretation of the no-preference clause applies to this case, we nevertheless would conclude that section 594.3, subdivision (a) does not, as LaDuke asserts, provide greater protection to religious institutions or demonstrate a preference for religious property. To the extent that statute provides for greater punishment than section 594 does, that difference does not show a

22

E

*Equal protection clauses.*

LaDuke asserts section 594.3, subdivision (a) is unconstitutional because it violates the equal protection clauses of the United States and California Constitutions. The Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." Article I, section 7 of the California Constitution provides: "A person may not be . . . denied equal protection of the laws." The California Supreme Court has stated that California's equal protection clause is substantially the equivalent of the federal equal protection clause. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 571-572.) In general, equal protection of the laws means that no person or class of persons shall be denied the same protection of the laws that is enjoyed by other persons or classes of persons in like circumstances. (*People v. Wutzke* (2002) 28 Cal.4th 923, 943.)

To show a violation of the equal protection clauses, a defendant must satisfy a two-step test. First, the defendant must show "that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530.) "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Second, the defendant must show there is no sufficient justification for the unequal treatment.

preference for religious institutions. Furthermore, *Sands* addressed religious invocations at a public high school graduation ceremony and therefore is factually inapposite to this case. (*Sands*, *supra*, 53 Cal.3d at p. 868.)

23

(*People v. Chatman* (2018) 4 Cal.5th 277, 288.)  The level of justification needed "depends on the nature or effect of the classification at issue." (*Ibid*.)  If there is no suspect classification or fundamental right involved, the defendant must show that the challenged classification bears no rational relationship to a legitimate government purpose. (*Id.* at pp. 288-289; *People v. Turnage* (2012) 55 Cal.4th 62, 74; *Romer v. Evans* (1996) 517 U.S. 620, 635.)  However, when the disparity implicates a suspect class or a fundamental right, strict scrutiny applies. (*Warden v. State Bar* (1999) 21 Cal.4th 628, 641.)  In those cases, the government bears the burden to show there is a compelling state interest for the disparate treatment and that the classifications are necessary to further that interest. (*In re Smith* (2008) 42 Cal.4th 1251, 1263; *People v. Olivas* (1976) 17 Cal.3d 236, 251; *Serrano v. Priest* (1971) 5 Cal.3d 584, 597.)  If the classifications involve gender or illegitimacy, an intermediate level of scrutiny applies. (*In re Smith*, at p. 1263.)

Contrary to LaDuke's assertion, we conclude section 594.3, subdivision (a) and section 594, the general vandalism statute, do *not* affect two similarly situated groups in an unequal manner under the first step of the equal protection test because those statutes define different crimes.  Under section 594, a person commits the crime of vandalism if he or she "maliciously commits any of the following acts with respect to any real or personal property not his or her own . . . :  (1) [d]efaces with graffiti or other inscribed material. [¶]  (2) [d]amages. [¶]  [or] (3) [d]estroys" and is subject to various punishment based on the amount of damage caused. (§ 594, subds. (a), (b).)  If the amount of damage is $400 or more, the crime is felony vandalism, subjecting the defendant to imprisonment

24

pursuant to section 1170, subdivision (h), or in a county jail for a period not exceeding one year, or a fine of not more than $10,000, or both a fine and imprisonment. (§ 594, subd. (b)(1).) However, if the amount of damage is $10,000 or more, the fine may be up to $50,000. (§ 594, subd. (b)(1).) If the amount of damage is less than $400, the crime is misdemeanor vandalism, generally subjecting the defendant to imprisonment in a county jail not exceeding one year, or a fine of not more than $1,000, or both a fine and imprisonment.[9] (§ 594, subd. (b)(2)(A).)

In contrast, under section 594.3, subdivision (a) a person commits the crime of felony vandalism against religious property without regard to the amount of damage, if any, caused. Furthermore, that crime includes a knowledge requirement, i.e., the person must "knowingly" commit the act of vandalism against a building owned and occupied by a religious educational institution or other religious property described in the statute. (§ 594.3, subd. (a).) Section 594 does not include such a knowledge requirement. Therefore, the crimes under section 594 and section 594.3, subdivision (a) are different crimes. Because they are different crimes, persons who commit those respective crimes are not similarly situated. LaDuke has not persuaded us otherwise. Accordingly, LaDuke has not satisfied the first step of the two-step test and his equal protection clause challenge necessarily fails. (*In re Eric J.*, *supra*, 25 Cal.3d at p. 530; *Cooley v. Superior Court*, *supra*, 29 Cal.4th at p. 253.)

---

[9] If, however, the defendant has been previously convicted of vandalism, the punishment *ante* for misdemeanor vandalism may include a fine of not more than $5,000. (§ 594, subd. (b)(2)(B).)

25

Assuming arguendo that persons who commit crimes under section 594 and section 594.3, subdivision (a) are similarly situated, we nevertheless conclude LaDuke has not carried his burden to show that California does not have any rational basis for treating those two classes of persons differently (i.e., that the classifications bear no rational relationship to a legitimate governmental purpose). We reject his argument that the two classes of persons involve suspect classifications or fundamental interests that trigger the strict scrutiny standard. Contrary to LaDuke's assertion, the two crimes do not involve a person's freedom to hold, or not hold, religious beliefs. Rather, the crimes involve acts of vandalism against property, regardless of the offender's religious beliefs or the lack thereof.

Applying the rational relationship standard to the two classes of offenders, we conclude, as the People argue, that those classifications have a rational relationship to the legitimate governmental purpose of protecting religious properties from vandalism which, in turn, protects the free exercise of religion without the inherent intimidation or disruption caused by such vandalism. (Cf. *State v. Vogenthaler* (N.M.Ct.App. 1976) 548 P.2d 112, 115 [rejecting equal protection clause challenge because "there is a rational basis for treating criminal damage to a church differently than criminal damage to other property. Churches 'uniquely contribute to the pluralism of American society by their religious activities.' [Citation.] . . . A rational basis for treating criminal damage to a church differently than criminal damage to other property is the role of religion in society as a whole."].) Therefore, to the extent section 594.3, subdivision (a) imposes greater punishment than section 594, there is a rational relationship for that differential treatment

26

to the legitimate governmental purpose of protecting the free exercise of religion. Accordingly, LaDuke has not satisfied the second step of the two-step test and his equal protection clause challenge necessarily fails. (*People v. Turnage*, *supra*, 55 Cal.4th at p. 74; *Romer v. Evans*, *supra*, 517 U.S. at p. 635.)

## III

*Section 594 as a Lesser Included Offense of Section 594.3, Subdivision (a)*

LaDuke contends his conviction for felony vandalism causing over $400 in damage (§ 594, subds. (a), (b)(1)) must be reversed because it is a necessarily included offense of vandalism of a religious educational institution (§ 594.3, subd. (a)).

## A

In general, a defendant may be convicted of multiple offenses arising out of the same act or course of conduct. (§ 954; *People v. Sanders* (2012) 55 Cal.4th 731, 736.) However, that general rule is subject to "a judicially created exception [that] prohibits multiple convictions based on necessarily included offenses." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034.) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*Sanders*, at p. 736.)

"In deciding whether multiple conviction is proper, a court should consider only the statutory elements." (*People v. Reed* (2006) 38 Cal.4th 1224, 1229.) "Under the elements test, if the statutory elements of the greater offense include all of the statutory

27

elements of the lesser offense, the latter is necessarily included in the former." (*Id*. at p. 1227.) Alternatively stated, if the greater offense cannot be committed without also committing the lesser offense, the lesser offense is a necessarily included offense of the greater offense. (*Ibid.*)

B

LaDuke argues that his section 594 offense is a necessarily included offense of his section 594.3, subdivision (a) offense and therefore the former offense must be reversed. We disagree. LaDuke was convicted of felony vandalism under section 594, which offense, as discussed in section II(E) *ante*, requires damage of $400 of more. (§ 594, subds. (a), (b)(1).) Under section 594, a person commits the crime of felony vandalism if he or she "maliciously commits any of the following acts with respect to any real or personal property not his or her own . . . : (1) [d]efaces with graffiti or other inscribed material. [¶] (2) [d]amages. [¶] [or] (3) [d]estroys" and the amount of damage is $400 or more. (*Id*., subds. (a), (b)(1).) In contrast, the section 594.3, subdivision (a) offense of felony vandalism against religious property may be committed with little, or no, damage to property.[10] Each offense includes an element not contained in the other—the nature of the property in section 594.3, subdivision (a) and the dollar amount specified in section 594.

Alternatively stated, unlike section 594 felony vandalism, the amount of damage caused to property is not an element of a section 594.3, subdivision (a) offense. Therefore, contrary to LaDuke's assertion, section 594 felony vandalism is not a

---

10   As quoted *ante*, section 594.3, subdivision (a) provides: "Any person who knowingly commits any act of vandalism to a church, synagogue, mosque, temple, building owned and occupied by a religious educational institution, or other place primarily used as a place of worship where religious services are regularly conducted or a cemetery is guilty of a crime punishable by imprisonment in a county jail for not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170."

necessarily included offense of a section 594.3, subdivision (a) offense.[11] (*People v. Reed*, *supra*, 38 Cal.4th at pp. 1227, 1229.) Accordingly, his section 594 conviction need not be reversed as he contends. Based on the same reasoning, we likewise reject LaDuke's assertion that the fines and fees imposed in connection with his section 594 conviction must be stricken.

IV

*Electronics Search Probation Condition*

LaDuke contends the electronics search condition of his probation is unconstitutionally overbroad. Because we conclude *post* that the electronics search probation condition was unreasonable in this case, we strike that condition and therefore do not address LaDuke's constitutional overbreadth argument.

A

The probation report noted that LaDuke stated he had been homeless for 30 years and had not been employed since 1995. He stated he did not have access to a computer or cellular phone. The probation report showed that prior to the instant offenses, he had criminal convictions in 1991, 1998, and 2000, and was granted probation in all three cases. There were no reports of any probation violations by LaDuke in those cases. The probation officer recommended that the court grant LaDuke formal probation and

---

[11]     Contrary to LaDuke's assertion, the fact that CALCRIM No. 2901 refers to the People's burden under section 594 to prove the "allegation" that the amount of damage caused by the vandalism was $400 or more and, if so, was also $10,000 or more, does not persuade us that the statutory elements of a section 594 felony vandalism offense do not include the element that the amount of damage be $400 or more.

proposed certain conditions of probation, including No. 6(n): "Submit person, vehicle, residence, property, personal effects, *computers, and recordable media . . .* to search at any time with or without a warrant, and with or without reasonable cause, when required by [a probation officer] or law enforcement officer." (Italics added.)

At sentencing, the trial court stated that it had read the probation report and was inclined to follow its recommendations. The court noted that although LaDuke had a criminal record, it was "somewhat insignificant and fairly old." Finding probation was appropriate, the court suspended imposition of sentence and placed LaDuke on formal probation for three years with the condition that he serve 365 days in jail and subject to the other conditions of probation recommended in the probation report, including condition No. 6(n), as quoted *ante*. LaDuke did not object to any of the conditions of probation.

B

"The sentencing court has broad discretion to determine whether an eligible defendant is suitable for probation and, if so, under what conditions." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) The court has broad power when granting probation, "to impose any 'reasonable conditions, as it may determine are fitting and proper to the end that justice may be done . . . specifically for the reformation and rehabilitation of the probationer . . . .' (Pen. Code, § 1203.1, subd. (j).)" (*People v. Olguin* (2008) 45 Cal.4th 375, 379 (*Olguin*).)

"We review conditions of probation for abuse of discretion. [Citations.] Generally, '[a] condition of probation will not be held invalid unless it "(1) has no

31

relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . ." ' " (*Olguin*, *supra*, 45 Cal.4th at p. 379, citing *People v. Lent* (1975) 15 Cal.3d 481, 486 (*Lent*).)  "This test is conjunctive—all three prongs must be satisfied before a reviewing court will invalidate a probation term.  [Citations.]  As such, even if a condition of probation has no relationship to the crime of which a defendant was convicted and involves conduct that is not itself criminal, the condition is valid as long as the condition is reasonably related to preventing future criminality."  (*Olguin*, at pp. 379-380.)  A probation condition that enables a probation officer to effectively supervise the defendant may be found to be reasonably related to prevention of future criminality.  (*Id*. at pp. 380-381.)

Furthermore, "[a] probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad."  (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.)  "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights . . . ."  (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153.)  We review de novo constitutional challenges to probation conditions.  (*In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

C

Because LaDuke did not object below to the electronics search probation condition, he arguably forfeited any challenge on appeal to that condition.  However, the

People do not argue that LaDuke forfeited any constitutional or other challenge to that probation condition. Therefore, we may consider his contention on appeal that the trial court erred by imposing the electronics search probation condition.

In any event, to the extent LaDuke forfeited any reasonableness challenge under *Lent, supra,* 15 Cal.3d 481, by not objecting below to the probation condition on that ground, we nevertheless elect to exercise our discretion to address that issue to avoid a future possible claim of ineffective assistance of counsel.[12] (Cf. *People v. Mattson* (1990) 50 Cal.3d 826, 854 [court considered issues not raised in trial court "to forestall a later claim that trial counsel's failure to [raise those issues] reflects constitutionally inadequate representation"].) In *People v. Williams* (1998) 17 Cal.4th 148, the court stated that although a party generally cannot complain about the manner in which the trial court exercises its sentencing discretion for the first time on appeal, "[a]n appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party" and "has the authority to" address on appeal the question of the trial court's exercise of its sentencing discretion. (*Id.* at p. 161, fn. 6.) "Whether or not [an appellate court] should [address that question] is entrusted to its discretion." (*Ibid.*) In *In re Sheena K., supra,* 40 Cal.4th 875, the court stated: "In general, forfeiture of a claim not raised in the trial court by a party has not precluded review of the claim by an appellate court in the exercise of that court's discretion." (*Id.* at p. 887, fn. 7.) That court

_____

12    In *People v. Welch* (1993) 5 Cal.4th 228, 237, the court held that "failure to timely challenge a probation condition on [*Lent*] grounds in the trial court waives the claim on appeal."

noted: "The appellate courts typically have engaged in discretionary review only when a forfeited claim involves an important issue of constitutional law or a substantial right." (*Ibid.*) Furthermore, an appellate court may exercise its discretion to consider that issue even though the parties did not raise it on appeal. (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1341, fn. 6.) Because the imposition of an unreasonable probation condition affects the substantial rights of a defendant, we exercise our discretion to address the issue of whether the electronics search probation condition imposed on LaDuke was unreasonable under *Lent* even though he did not raise it below or on appeal.

Regarding the first prong of the *Lent* test, it is indisputable based on the record on appeal that the electronics search probation condition has no relationship to the crimes of which LaDuke was convicted. (*Lent*, *supra*, 15 Cal.3d at p. 486.) He was convicted of arson (§ 451, subd. (d)), vandalism of a building owned and occupied by a religious educational institution (§ 594.3, subd. (a)), and vandalism causing damage in excess of $400 (§ 594, subds. (a), (b)(1)). All of those offenses were based on his conduct in lighting the University's sign on fire and damaging it. There is no evidence showing LaDuke used computers or recordable media in preparing for or committing those offenses. In fact, the record supports a contrary conclusion. The probation report noted that LaDuke stated he did not have access to a computer or cellular phone. He also stated he had been homeless and unemployed for 30 years. Therefore, we conclude the electronics search probation condition has no relationship to the crimes of which LaDuke was convicted. (*Lent*, at p. 486.)

34

Regarding the second prong of the *Lent* test, it is likewise indisputable that the electronics search probation condition relates to conduct which is not in itself criminal. (*Lent*, *supra*, 15 Cal.3d at p. 486.)  The possession and use of computers and recordable media, as commonly used by individuals in contemporary society, is lawful and does not violate any criminal laws.  Therefore, we conclude the electronics search probation condition relates to conduct which is not in itself criminal.  (*Ibid.*)

Regarding the third prong of the *Lent* test, we conclude the electronics search probation condition requires or forbids conduct which is not reasonably related to future criminality in this case.[13]  (*Lent*, *supra*, 15 Cal.3d at p. 486.)  Based on the undisputed facts in this case, LaDuke's offenses were committed without the use of any computers or recordable media.  Furthermore, LaDuke does not have access to a computer or cellular phone.  He has been homeless and unemployed for 30 years.  As the trial court noted at sentencing, his criminal record was insignificant and old.  He had been granted probation in three prior cases and apparently successfully completed probation in those cases without any violations.  Accordingly, there is no evidence to support a finding that the electronics search probation condition is reasonably related to preventing LaDuke's future

---

[13]     We note the issue of the validity of an electronics search probation condition under *Lent* and its progeny is currently pending before the California Supreme Court. (See, e.g., *People v. Ermin* (July 10, 2017, H043777) [nonpub. opn.], review granted Oct. 25, 2017, S243864; *People v. Nachbar* (2016) 3 Cal.App.5th 1122, review granted Dec. 14, 2016, S238210; *In re A.S.* (2016) 245 Cal.App.4th 758, review granted May 25, 2016, S233932; *In re Mark C.* (2016) 244 Cal.App.4th 520, review granted Apr. 13, 2016, S232849; *In re Ricardo P.* (2015) 241 Cal.App.4th 676, review granted Feb. 17, 2016, S230923.)  Until that court provides further direction on that issue, we decide this case based on our understanding of current law and the record in this case.

criminality. (*Olguin, supra*, 45 Cal.4th at pp. 379-380.) In particular, there is insufficient evidence to support a finding that the electronics search probation condition would enable a probation officer to effectively supervise LaDuke. (*Id.* at pp. 380-381.) There was no showing below as to how the electronics search condition would reasonably prevent any future crime or aid in LaDuke's rehabilitation.

In the circumstances of *In re Erica R.* (2015) 240 Cal.App.4th 907 (*Erica R.*), the court concluded that an electronics search probation condition was not reasonably related to the juvenile's future criminal activity, stating:

> " '[n]ot every probation condition bearing a remote, attenuated, tangential, or diaphanous connection to future criminal conduct can be considered reasonable.' [Citation.] There is nothing in this record regarding either the current offense or Erica's social history that connects her use of electronic devices or social media to illegal drugs. In fact, the record is wholly silent about Erica's usage of electronic devices or social media. Accordingly, '[b]ecause there is nothing in [Erica's] past or current offenses or [her] personal history that demonstrates a predisposition' to utilize electronic devices or social media in connection with criminal activity, 'there is no reason to believe the current restriction will serve the rehabilitative function of precluding [Erica] from any future criminal acts.' " (*Id.* at p. 913.)

Accordingly, the court struck the electronics search probation condition as unreasonable and invalid under *Lent*. (*Erica R.*, at pp. 913-915.)

The nexus between the electronics search probation condition and LaDuke's future criminality is more obviously absent in this case than it was in the circumstances of *Erica R, supra,* 240 Cal.App.4th 907. In that case, the juvenile apparently had access to, or the use of, electronic devices. Absent a reasonable factual basis for the trial court to decide that the electronics search condition would assist the probation department in

36

supervising LaDuke or would otherwise prevent him from committing future crimes, that probation condition is unreasonable and invalid, and we therefore conclude the court abused its discretion by imposing it.  (*Olguin*, *supra*, 45 Cal.4th at pp. 379-381; *Lent*, *supra*, 15 Cal.3d at p. 486.)  Because we dispose of LaDuke's challenge of that probation condition on that ground, we need not, and do not, address his contention that the electronics search probation condition was unconstitutionally overbroad.

## DISPOSITION

The language setting forth the electronics search condition in No. 6(n) of the probation order (i.e., "computers, and recordable media") is stricken from that order.  In all other respects, the judgment of conviction is affirmed.  The superior court is directed to amend the probation order accordingly.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


AARON, J.

37